GREAT SOUTHWEST FIRE INSURANCE COMPANY *vs.*
HERCULES BUILDING & WRECKING COMPANY, INC., &
others.[1]

No. 92-P-621.

Suffolk. May 10, 1993. - September 15, 1993.

Present: SMITH, KAPLAN, & GREENBERG, JJ.

*Insurance*, General liability insurance, Coverage, Workers' compensation
insurance, Construction of policy. *Negligence*, Failure to obtain work-
ers' compensation coverage, Employer. *Corporation*, Officers and
agents. *Workers' Compensation Act*, Failure to obtain insurance.

In an action for declaratory relief arising from a construction accident, the
judge correctly ruled that a corporation's policy of general liability in-
surance excluded the risk that the insured's president and treasurer
would negligently fail to secure workers' compensation insurance for
the benefit of its employees. [303-305]
On appeal from a judgment declaring insurers' rights with respect to a
settlement of claims arising from a construction accident, this court
concluded that a corporation's policy of comprehensive general liability
insurance did not exclude the risk that the insured's president and trea-
surer would fail in his duty to use reasonable care to create and main-
tain a safe workplace, with the result that one of the insured's employ-
ees would suffer bodily injury. [305-308]

CIVIL ACTION commenced in the Superior Court Depart-
ment on May 24, 1985.

The case was heard by *Barbara J. Rouse*, J., on motions
for summary judgment.

*Michaela F. Collins* for National Union Fire Insurance
Company.

*John P. Graceffa* for the plaintiff.

---

[1]Harold Monsini, National Union Fire Insurance Company,
Commercial Union Insurance Company, Paul Murray, Lorraine Murray,
and the children of Paul Murray and Lorraine Murray.

KAPLAN, J. On August 1, 1983, the Genetics Institute of Boston engaged the Henry E. Wile Corporation to demolish a building in Cambridge and construct another in its place. The Wile Corporation subcontracted the demolition work to the Duane Corporation (Duane), and Duane in turn subcontracted it by oral contract to Hercules Building and Wrecking Company, Inc. (Hercules).

Harold Monsini, the owner, president, treasurer, and worksite manager of Hercules, sometime in August 1983 put Paul Murray to work on the demolition job at a wage of $250 a week, paid in cash. On September 7, 1983, Murray was standing on scaffolding at the site, removing piping with tools supplied by Hercules. As Murray cut a hanger from which the piping was suspended, the piping fell onto the scaffolding, upsetting it. Murray fell and suffered severe injuries.

We recount some litigative history to bring the present appeal to focus.

In October, 1984, Murray commenced an action in Superior Court against Hercules, Monsini, and Duane (and another). Without detailing all the allegations of the complaint, it will be enough to say that Murray charged Hercules and Monsini, in effect, with negligent failure to secure and maintain workers' compensation insurance, and Monsini and Duane with negligence in failing to use reasonable care to maintain a safe workplace. Joining as plaintiffs in the action, alleging loss of consortium, were Murray's wife and the children of the family. Substantial damages were demanded.

Hercules in fact had no workers' compensation insurance. It did have comprehensive general liability (CGL) insurance with Great Southwest Fire Insurance Company (Great Southwest). Duane had CGL insurance with National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), and workers' compensation insurance with Commercial Union Insurance Company (Commercial Union).

With the Murray action pending, Great Southwest gave notice "to whom it may concern" on February 8, 1985, that "[i]f it is later determined that Mr. Murray was in fact an

employee of yours [Hercules] at the time of his injury, then, Great Southwest Fire Insurance Company will withdraw its defense [in the Murray action] and refuse to indemnify you for this loss." On April 3, 1985, Great Southwest gave notice that it was disclaiming coverage in an action by Commercial Union against Hercules and Monsini to recoup the workers' compensation benefits Commercial Union had provided to Murray: the workers' compensation obligation fell on Duane since Hercules, its subcontractor, had failed to provide this protection, and Commercial Union, as Duane's insurer, was demanding reimbursements, see G. L. c. 152, § 18.[2]

On May 24, 1985, Great Southwest brought a declaratory action in Superior Court against Hercules, Murray (and his family), and Commercial Union seeking a ruling, in essence, that its CGL policy did not cover Hercules for the claims constituting the Murray action. This declaratory action was consolidated for trial with the Murray action.

Here followed a long pause. Hearings before the Department of Industrial Accidents, with the interested parties represented, took place in October 1985, October 1986, May 1987, February 1988, and April 1988. These eventuated, in October 1988, in a report by an administrative judge of the department to the effect that Murray was an employee of Hercules at the time of the accident (a matter that had been disputed), that Hercules was then uninsured for workers' compensation benefits, and that Commercial Union, as Duane's insurer, was thus liable in the first instance to pay Murray appropriate benefits as described in the report (amounting to $13,581.27 for temporary total incapacity compensation benefits from November 7, 1983, to May 25, 1985, plus medical expenses and attorney's fees). The administrative judge reported that he disbelieved Monsini's testimony that he had given a check to an insurance agent before the accident to procure workers' compensation coverage for Hercules.

---

[2]Duane had sued Hercules and Monsini to recoup expenditures by or on behalf of Duane in favor of Murray.

35 Mass. App. Ct. 298        301

Great Southwest Fire Ins. Co. v. Hercules Building & Wrecking Co.

On March 22, 1989, the Murray action (and associated litigation) was settled for $395,000, with a contribution of $197,500 by Great Southwest and a like contribution by National Union and the Wile Corporation. The agreement of settlement contemplated that final adjustment as between Great Southwest and National Union would await the result of the declaratory action (amended on May 10, 1989, to include Monsini and National Union as parties defendant) on the following contingent basis:

> If the Court declares that there is insurance coverage under [the Great Southwest policy] for either Harold Monsini or Hercules for the personal injury claim of Paul Murray, then Great Southwest will pay National Union the sum of $197,500.00 without interest, costs or attorneys fees.[3]

Otherwise, the settlement agreement provided, National Union would pay a like sum to Great Southwest.[4]

A stipulation of facts (in part recounting the facts set out above) was entered into in aid of the declaratory action, and in August, 1990, the parties cross-moved in that action for summary judgment.

A judge of the Superior Court ruled in Great Southwest's favor that there was no coverage under the CGL portion of its policy for either Hercules or Monsini, so National Union must make payment to Great Southwest. National Union appeals, contesting seriously only the negative holding with respect to Monsini. We hold that Great Southwest's policy affords coverage to Monsini as described at our points 2b(ii) and 3 below. Accordingly, we reverse and remand.

---

[3] A special provision regarding the loss of consortium claims in the Murray action will be noted at our point 3 below.

[4] The theory of the arrangement evidently was, under the policies or more general considerations, that any liability of Great Southwest to Hercules or Monsini was primary, National Union's secondary. The record does not describe the parties' reasoning on the matter. Whatever the theory, we are concerned with carrying out the provisions of the settlement agreement and thus of Great Southwest's policy.

1. *CGL coverage under Great Southwest's insurance policy.* The CGL provisions of Great Southwest's insurance policy state: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay in damages because of *A.* bodily injury or *B.* property damage to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . ."

Under "Persons Insured," the policy states: "Each of the following is an insured under this insurance to the extent set forth below: . . . if the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such . . . ."[5]

These provisions, taken together, on their face foretell coverage of the insureds — namely, Hercules, as designated corporation, and Monsini, as executive officer thereof — with regard to Murray's bodily injury in the occurrence of September 7, 1983 — unless relevant "exclusions" are to be found in the policy.

2. *Exclusions from Great Southwest's CGL coverage.* We are to recall, to begin with, that when a party relies upon a "separate and distinct" exclusion, that party bears the burden of demonstrating that the exclusion applies. See *Ratner v. Canadian Univ. Ins. Co.,* 359 Mass. 375, 381 (1971), quoting from *Murray v. Continental Ins. Co.,* 313 Mass. 557, 563 (1943). See also *Camp Dresser & McKee, Inc. v. Home Ins. Co.,* 30 Mass. App. Ct. 318, 321 (1991). Moreover, exclusions are to be read literally, without poetic license — they are "to be strictly construed." *Quincy Mut. Fire Ins. Co. v. Abernathy,* 17 Mass. App. Ct. 907, 908 (1983), quot-

---

[5]The policy also states: "The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of company liability . . . ."

35 Mass. App. Ct. 298                           303

Great Southwest Fire Ins. Co. *v.* Hercules Building & Wrecking Co.

ing from *Vappi & Co.* v. *Aetna Cas. & Sur. Co.*, 348 Mass. 427, 431 (1965).

In its letter of February 8, 1985, reserving rights, Great Southwest cited two clauses of exclusion. According to its policy, "[t]his insurance does not apply: . . . (i) to any obligation for which the insured or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law; (j) to bodily injury to any employee of the insured arising out of and in the course of his employment by the insured or to any obligation of the insured to indemnify another because of damages arising out of such injury . . . ."

a. *Application to Hercules.* We look first to the component of the Murray action that complained of Hercules's failure to procure workers' compensation insurance for its employees. Accepting, as did the Department of Industrial Accidents and the judge of the Superior Court, that Murray was Hercules's employee, Great Southwest asserts correctly that exclusion (i) barred coverage of Hercules to the extent of its obligation to see to the provision of the workers' compensation benefits owed to Murray.

And, accepting again Murray's status as Hercules's employee, exclusion (j) clearly prevented coverage of Hercules regarding Murray's bodily injury.

The judge was in accord on both scores, exonerating Great Southwest as to Hercules, and, as noted, National Union presents no material argument to the contrary.

b. *Application to Monsini.* (i) *Negligent failure to secure workers' compensation insurance.* Remaining in controversy is the question of the coverage or exclusion from coverage of Harold Monsini, an insured under the CGL portion of Great Southwest's policy as an executive officer of Hercules, the named insured.

Monsini, in his individual role as such an officer, was obliged to see to the procurement of workers' compensation insurance for the benefit of Hercules's employees. This follows from the Supreme Judicial Court's decision in *LaClair* v. *Silberline Mfg. Co.*, 379 Mass. 21 (1979). LaClair was an

304　　　　　　　　　　　　　　　　35 Mass. App. Ct. 298

Great Southwest Fire Ins. Co. *v.* Hercules Building & Wrecking Co.

employee of Marian Plastics, Inc., a corporation engaged in manufacturing and coloring plastics. On the day of the accident, LaClair was mixing aluminum powder with colors of polystyrene plastic to obtain a silver-colored plastic. A static spark evidently ignited aluminum dust, and in the explosion LaClair suffered burns that resulted in his death. One Robert E. Lewis, the president and treasurer of the corporation as well as its general manager, was a defendant in the action brought by the administratrix, and one of the claims brought against him was for his failure through negligence to procure workers' compensation insurance for the corporation's employees. *Id.* at 23-24. The court held that Lewis must answer to this charge. See *id.* at 34. The reasoning goes thus.

Since 1943, workers' compensation protection, furnished by insurance (or self-insurance), has been required of most employers by statute. The obligation to secure this protection is cast not only on a corporate employer proper but also upon the corporation's president and treasurer. By G. L. c. 152, § 25C, he or she is made criminally punishable for the corporation's default.[6] See *id.* at 26-27. Such a violation on the part of the corporate executive, while not conclusive of his or her civil liability, is "evidence of a violator's negligence as to all consequences that the statute was intended to prevent." *Id.* at 28. (The "consequences" here consist of liability for the dollar equivalent of the benefits the employee would be entitled to receive under the statutory system. See *id.* at 30.) The court in *LaClair* also noted that Lewis had reason to know not only of the corporation's precarious financial situation, which heightened the importance to its employees of workers' compensation, but also of the probability of industrial accidents in the line of work. See *id.* at 28.

---

[6]General Laws c. 152, § 25C(5), as appearing in St. 1987, c. 691, § 10, reads as follows: "In addition to being subject to the civil penalties herein provided, an employer who fails to provide for insurance or self-insurance as required by this chapter shall be punished by a fine of not more than one thousand five hundred dollars or by imprisonment for not more than one year, or both. . . . If such employer is a corporation, the president or treasurer or both shall be liable for said punishment. . . ."

35 Mass. App. Ct. 298    305

Great Southwest Fire Ins. Co. v. Hercules Building & Wrecking Co.

The position of Monsini parallels that of Lewis in the *LaClair* case. As president and treasurer of Hercules, Monsini had the responsibility of ensuring that Hercules had workers' compensation coverage, and his failure to do so exposed him to the penalties outlined in G. L. c. 152, § 25C. Moreover, it may be noted that he could have anticipated accidents in the course of the demolition work, especially in Murray's case, as Murray had no experience in this work.

However, it is not a question whether Monsini would have won or lost had Murray's workers' compensation-related claim against him been tried, but rather a question of the nature of the "obligation" that formed the basis of Murray's asserted claim. Although the point is not absolutely clear, we think, in agreement with the judge below, that Great Southwest makes a case that Monsini's "obligation" to secure workers' compensation insurance for Hercules's employees was so far derived from, and integral to, the workers' compensation statute that it fell within exclusion (i) of the policy's CGL provisions; the risk that Monsini would negligently fail in fulfilling that obligation was an excluded risk by the terms of exclusion (i). Cf. *Hanover Ins. Co* v. *Ramsey*, 405 Mass. 1101, 1101 (1989).

(ii) *Duty to use reasonable care to maintain safe workplace.* When it comes to the risk that Monsini would fail in his duty to use reasonable care to create and maintain a safe workplace, Great Southwest is unable to show that the risk of resultant bodily injury is excluded by any of the provisions in the CGL portion of its policy.[7]

That Monsini was under the duty described is also settled by the *LaClair* decision. In that case, the administratrix

---

[7]The judge of the Superior Court did not treat separately this claim against Monsini, as manager, to see to the provision of safe conditions of work. Possibly she thought that the exclusion she had found regarding Monsini's obligation to secure workers' compensation insurance somehow extended automatically to his safe-workplace duty. This would be mistaken.

We may note that the damages Murray might have recovered on a trial of the safe-workplace claim could have far exceeded a recovery on his workers' compensation-related claim.

made a second claim against Lewis, charging him in his individual role with negligent failure to use reasonable care to provide a safe workplace. Of this, the court said: "It is unquestionably true that Lewis, as the sole manager of the Marian Plastics plant, owed LaClair duties to use reasonable care to provide him with a safe place in which to work and to furnish and maintain reasonably safe and proper machinery and equipment with which to perform his assigned tasks." *LaClair*, 379 Mass. at 30 (footnote omitted).[8] (The court, however, went on to find that it was right for the trial court to have directed a verdict against Lewis on this claim because there was no evidence of causation: "no proof that 'but for' this negligence the injury to LaClair would not have occurred." *Id.* at 31.)

Monsini, the self-admitted "supervisor" of Hercules's on-site operations, was under the same duty as Lewis, and we have to assume for purposes of the present case that breach of that duty could result in bodily injury to Murray. Therefore the CGL provisions of Great Southwest's policy cover the risk unless the insurer can point to an applicable exclusion. It cannot.

Exclusion (i) does not apply because Monsini's duty to use reasonable care to furnish a safe workplace, as described in *LaClair*, is a common law (nonstatutory) duty and is not (to quote again the words of [i]) an "obligation for which the insured . . . may be held liable under any workmen's compensation . . . law." In contrast is Monsini's responsibility to use reasonable efforts to obtain workers' compensation insurance: a responsibility that has a source in the statute, as we have indicated. Great Southwest's attempt to tie the *LaClair* safe-workplace duty to the workers' compensation statute is unavailing.[9]

---

[8]The court cites *Roberts* v. *Frank's Inc.*, 314 Mass. 42, 45 (1943), and cases therein cited, and refers also to *United States* v. *Sancolmar Indus., Inc.*, 347 F. Supp. 404, 408 (E.D.N.Y. 1972), and *O'Keefe* v. *Warner*, 288 So. 2d 911, 915 (La. Ct. App. 1973).

[9]Its citation of G. L. c. 152, § 28 (as appearing in St. 1943, c. 529, § 9), providing for double workers' compensation payments for "serious and wilful misconduct" on the part of an employer, is quite irrelevant.

Exclusion (j) is inapplicable because it speaks of "any employee of the insured": Murray was an employee not of Monsini but of Hercules; this exclusion deprives Hercules of coverage, as we have seen, but not Monsini.

The effect of the foregoing is that Monsini as executive officer-insured has bodily injury coverage.

Great Southwest now mentions a provision of the policy (not cited in its letters of February 8 and April 3, 1985) in hopes that it may be treated as an exclusion against Monsini. An endorsement entitled "Additional Insured (Employees)" states: "It is hereby understood and agreed that the 'Persons Insured' provision is amended to include any employee of the named insured while acting within the scope of his duties as such, but the insurance afforded to such employee does not apply: 1. To bodily injury to (a) another employee of the named insured arising out of or in the course of his employment . . . ."[10]

It is hardly plausible that a provision for coverage to employees as "additional insured," subject to a coemployee exception, can be fairly read to cut down the coverage otherwise provided for executive officers. If such was a purpose of Great Southwest, no more circuitous or improbable means of achieving it can be imagined. The endorsement is not relevant to the present case.

Nor, we may add, does the case fit the words of the endorsement. There is no indication of record[11] that Monsini had any arrangement with Hercules, express or implied, for the payment of compensation to him for any services he might perform as an officer of the corporation, nor is there any suggestion that he was on the payroll as an employee.

---

[10]It appears that the endorsement is what is commonly called a "cross employee exclusion," see 12 Couch, Insurance § 44A:73 (Rhodes rev. 2d ed. 1981), or "fellow employee exclusion," *Southern Guar. Ins. Co.* v. *Pittman*, 439 So.2d 7, 8 (Ala. 1983), intended "to preclude coverage in cases where compensation would be available to the injured employee" under workers' compensation laws. *Heiser* v. *Gibson*, 386 F. Supp. 901, 903 (E.D. La. 1974).

[11]The record includes the findings and report of the Department of Industrial Accidents and parts of the depositions of Murray and Monsini.

Thus he was not an "employee," if we take a workers' compensation definition of the term as a cogent reference.[12] It is possible for an executive officer of a corporation to have a place also in the line of regular working employees and to receive distinct compensation for that work. Cf. *Emery's Case*, 271 Mass. 46, 49 (1930). Monsini was distant from such a model. He appears as the absolute boss of the operation by his ownership and control, not as an employee. He hired employees (including Murray) and presumably could fire them. He set the terms of employment. He laid out and supervised the work of the employees at the site, gave them the necessary tools and safety equipment, and saw to the payroll. That he might on occasion pitch in and help out physically on some piece of work does not alter the picture. For examples of situations resembling the present where employee status was held not to exist, see *Ben-Jay Food Distribs.* v. *Warshaw*, 70 So. 2d 564, 564-565 (Fla. 1954); *Erickson* v. *Erickson Furniture Co.*, 179 Minn. 304, 306-307 (1930); *Holm* v. *H & S Asphalt Co.*, 283 Minn. 330, 330-331 (1969); *Duvick* v. *Industrial Commn.*, 22 Wis. 2d 155, 162-163 (1963).[13]

3. *Regarding the consortium claims.* The judge held that Great Southwest's policy afforded coverage of the consortium claims made by members of Murray's family. "Bodily injury" was taken, with the aid of language in the "Limits of Liability" part of the policy, to comprise the associational injury, and there was no relevant exclusion; it was also observed that the workers' compensation statute, at the date of Murray's accident or the commencement of Murray's action, did not bar suit for loss of consortium on the part of an injured employee's family, even if the employer had workers'

---

[12]"Employee" is there defined as "every person in the service of another under any contract of hire, express or implied, oral or written [with exceptions]." G. L. c. 152, § 1 (4), as appearing in St. 1985, c. 572, § 9.

[13]Because of our holding against Great Southwest on the question of the coverage of Monsini, we need not address ourselves to National Union's argument that Great Southwest should have been estopped to disclaim coverage of Monsini because it failed to reserve its right to disclaim in a timely or proper manner.

compensation insurance. That was the holding in *Ferriter* v. *Daniel O'Connell's Sons, Inc.*, 381 Mass. 507 (1980), later superseded by statute, G. L. c. 152, § 24, as appearing in St. 1985, c. 572, § 35. The parties do not debate any of this; it does not figure in the formula of the settlement agreement by which liability is determined as between the insurers; and the settlement payment to Murray engrosses and disposes of the consortium claims with the other claims in Murray's complaint.[14]

The judgment is reversed, and the case is remanded for entry of judgment in favor of National Union in conformance with this opinion.

*So ordered.*

---

[14]The settlement agreement had to deal with the handling of the consortium claim as between the insurers in the event — which under the present opinion has not occurred — that there was coverage by Great Southwest for only the loss of consortium claims. The insurers agreed that Great Southwest would then pay to National Union one-half of the amount that the court would allocate to those claims, without interest, costs, or attorney's fees.